\*\* E-filed 03-28-2011 \*\*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>MAXBOUNTY, INC., a Canadian corporation,<br><br>Defendant . | Case Number CV-10-4712-JF<br><br>ORDER[1] GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS<br><br>[Re: Docket No. 11] |

Pursuant to Fed. R. Civ. Pro. 12(b)(6), Defendant MaxBounty Inc. ("MaxBounty") moves to dismiss Claims One through Three asserted by Plaintiff Facebook, Inc. ("Facebook") for failure to state a claim upon which relief may be granted. The complaint includes claims for: (1) violation of 15 U.S.C. § 7701 ("CAN-SPAM Act"); (2) violation of 18 U.S.C. § 1030 ("Computer Fraud and Abuse Act"); (3) fraud; (4) tortious interference with contract; (5) breach of contract; (6) violation of 15 U.S.C. § 1125(c) (federal trademark dilution); and (7) violation of 15 U.S.C. § 1125(a) (false designation of origin). Facebook seeks compensatory, statutory, and

---

[1] This disposition is not designated for publication in the official reports.

punitive damages.  Facebook also requests disgorgement of profits, reasonable costs, and attorney's fees.

## I.  BACKGROUND

Facebook is a popular social networking website with more than 500 million active users. (Compl. ¶ 10.)  It is designed to be "a network that helps people communicate more efficiently and effectively with their friends, family, and co-workers." (*Id*.)  To become a Facebook user an individual must provide his or her real identity. (*Id*. at ¶¶ 11-12.)  Commercial, political, and charitable organizations also may establish a presence on Facebook by creating "pages" to which users can connect their profiles. (*Id*. at ¶ 14.)  All users must agree to Facebook's statement of rights and responsibilities.  Facebook's advertising guidelines prohibit false, misleading, fraudulent, and deceptive advertisements. (*Id*. at ¶ 37(c).)  They also prohibit advertisements that are "deceptive or fraudulent about any offer made," (*Id*. at ¶ 37(d)), and any advertisement that includes a "discount or free offer . . . must link to a page that clearly and accurately offers the exact deal the advertisement has displayed . . . ." (*Id*. at ¶37(h).)  Moreover, advertisements that contain, facilitate or promote spam are prohibited, (*Id*. at ¶ 37(j)), and if obtaining the promoted benefit requires user enrollment in a third-party subscription service then that requirement must be stated both in the advertisement and on the Facebook page. (*Id*. at ¶ 37(k).)

MaxBounty is an advertising and marketing company that uses a network of publishers to drive traffic to its customers' websites.  Its marketing program is based on a cost-per-action model ("CPA").  As explained on MaxBounty's website, "an advertiser under the CPA model pays only when a specific action is taken on their website.  The advertiser defines the action in advance and only pays when the action is taken . . . [g]enerally speaking, the more involved the action, the higher a publisher would expect to be paid for generating it."[2]  MaxBounty acts as an intermediary between its network of publishers (advertisement content creators) and its customers (third-party advertisers).  MaxBounty appears to generate revenue for its CPA program through a shared compensation agreement with its network of publishers.

---

[2] This information is available on http://www.maxbounty.com/faq.cfm.

2

Case No. CV-10-4712
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
(JFEX2)

1   Facebook alleges that MaxBounty engaged and continues to engage in impermissible
2   advertising and commercial activity on Facebook.com. (Compl. ¶¶ 40-41.) It asserts that
3   MaxBounty misleads its affiliates "into believing that its campaigns are approved by Facebook . .
4   . ." (*Id*. at ¶ 44.) It claims that MaxBounty facilitates traffic to its contracting advertiser websites
5   by "provid[ing] technical support to its affiliates on how to create fake Facebook campaigns, and
6   [by] provid[ing] substantial advance payments to its affiliates that agree to participate in
7   [MaxBounty's] Facebook campaigns." (*Id*.)[3] Facebook also claims that MaxBounty's conduct
8   has caused it economic damage, has "tainted the Facebook experience," resulting in economic
9   loss to many Facebook users, and has caused and continues to cause significant harm to
10  Facebook's reputation and goodwill. (*Id*. at ¶¶ 53-54.)

11  **A. The Alleged Fraudulent Scheme**

12  Facebook alleges that MaxBounty, through its network of affiliates, creates fake
13  Facebook pages that are intended to re-direct unsuspecting Facebook users away from
14  Facebook.com to third-party commercial sites. (Compl. ¶¶ 46-52.) It provides examples of two
15  such pages in the complaint. (*Id*.) Both pages utilize a similarly structured, multi-step scheme:
16  in the first step, MaxBounty establishes a network of affiliates; in the second step, MaxBounty's
17  affiliates create numerous Facebook pages that function like (and in effect are) advertisements; in
18  the third step, the page displays a message indicating that upon registration a user will be able to
19  take advantage of a "limited time offer," such as receiving a gift card or becoming a product
20  tester for a high-end product (e.g. an Apple iPad); in the fourth step, the Facebook user is
21  induced by the page and begins the registration process. (*Id*.) The registration process requires
22  three discrete user actions: (1) to become a "fan" of the page, (2) to invite all of his or her
23  Facebook friends to join to the page, and (3) to complete additional administrative registration
24  requirements. (*Id*. at ¶¶ 46, 50.) Upon completion of these requirements, Facebook users are not
25  sent the promised item but instead are directed "to a domain registered to and managed by

---

27   [3]Facebook alleges that MaxBounty's technical support includes "content suggestions and other tools that help and encourage its affiliates create fraudulent and deceptive Facebook pages."
28  (Compl. ¶ 45.)

3

Case No. CV-10-4712
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
(JFEX2)

Maxbounty that then redirects the user to a third-party commercial website . . . ." (*Id.* at ¶¶ 47, 50.)  The third-party commercial site informs the user that he or she must complete still more steps in order to obtain the promised item. (*Id.* at ¶¶ 48-52.) Such additional steps include signing up for numerous "sponsor offers," which typically are offers for memberships in subscription services. (*Id.*) Facebook asserts that "[MaxBounty] receive[s] payment for the traffic it delivers to [the third-party commercial sites] based on the [number of] users who successfully complete[] the steps to receive a free gift." (*Id.* at ¶¶ 48, 51.)

### B. MaxBounty's Motion to Dismiss

MaxBounty argues that Facebook's claim under the CAN-SPAM Act is insufficient as a matter of law because the "customer advertisements Facebook complains about . . . are not email and therefore cannot give rise to a claim under the Act." (Mot. to Dismiss, 1:7-11.) Facebook contends that communications on its website come within the meaning of "electronic mail messages" under the CAN-SPAM Act.  It argues that any other conclusion would be against the weight of the authority and run counter to "the plain language and legislative purpose of the act." (Pl.'s Opp. to MTD, 2:18-24.)

MaxBounty also contends that Facebook's claim under the Computer Fraud and Abuse Act ("CFAA") fails to satisfy the heightened pleading standard of Fed. R. Civ. Pro. 9(b), arguing that a plaintiff must plead with particularity "conduct which furthers the intended fraud." (Reply to Pl.'s Opp., 5:3-15.) Facebook asserts that "the majority of courts, and courts of this circuit, have held that claims under the CFAA are subject only to the notice pleading requirements of Rule 8(a)." (Pl.'s Opp., 6:9-12.) Even assuming *arguendo* that Rule 9(b) does apply, Facebook contends that its pleading is sufficiently particular. (*Id*. at 7:4-7.) MaxBounty also argues that Facebook has failed to plead adequately the elements of its state law claims for fraud, aiding and abetting, and conspiracy. (MTD, 1:18-23; 6:23-7:13). Facebook contends that its pleading is sufficiently particular as to those claims as well.

### II.  LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

4

1  *Centinela Hosp. Center*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of a motion to
2  dismiss, "all allegations of material fact are taken as true and construed in the light most
3  favorable to the nonmoving party." *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th
4  Cir. 1996). However, "[w]hile a complaint attacked by Rule 12(b)(6) motion to dismiss does not
5  need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his
6  'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of
7  the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955
8  (2007) (internal citations omitted). Leave to amend must be granted unless it is clear that the
9  complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66
10 F.3d 245, 248 (9th Cir. 1995).

## III. DISCUSSION

### A. Whether The Communications At Issue Are "Electronic Mail Messages" Under CAN-SPAM Act.

The CAN-SPAM Act makes it "unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transaction or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading." 15 U.S.C § 7704(a)(1). An "electronic mail message" is defined as "a message that is sent to a unique electronic mail address," (*Id*. at § 7702(6)), and an "electronic mail address" means a "destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox and a reference to an Internet domain (commonly referred to as a "domain part"), whether or not displayed, to which an electronic mail message can be sent or delivered." *Id*. at § 7702(5); *MySpace v. Wallace*, 498 F.Supp.2d 1293, 1300 (C.D. Cal. 2007).

MaxBounty argues that the "customer advertisements Facebook complains about are not e-mail and therefore cannot give rise to a claim under the CAN-SPAM Act." (MTD, 1:23-24.) MaxBounty attacks Facebook's characterization of the messages at issue as "electronic messages" and contends that strict adherence to the statutory definition of "electronic mail message" is necessary in evaluating the sufficiency of a CAN-SPAM Act claim. (*Id*. at 3:21-4:12.)

  No court in this circuit has addressed directly whether the CAN-SPAM Act applies to social networking communications under circumstances in which an electronic message is not delivered to an "inbox." However, courts in the Central District of California have rejected similar requests for a narrower construction of the Act in at least two cases. *See MySpace v. Wallace*, 498 F.Supp.2d 1293, 1300 (C.D. Cal. 2007); *see also Myspace v. The Globe.Com, Inc.*, 2007 WL 168696, at *4 (C.D. Cal. February 27, 2007). In *Myspace v. The Globe.Com*, the court interpreted the provisions of the CAN-SPAM Act expansively, observing that, "[t]he overarching intent of this legislation is to safeguard the convenience and efficiency of the electronic messaging system, and to curtail overburdening of the system's infrastructure . . . [l]imiting the protection to only electronic mail that falls within the narrow confines set forth by [d]efendant does little to promote the Congress's overarching intent in enacting CAN-SPAM." *The Globe.Com, Inc.*, 2007 WL at *4.

  In *MySpace v. Wallace*, the court again acknowledged expressly that a broad interpretation of the CAN-SPAM Act "supports the stated purpose of the Act, namely, curtailing the rapid and detrimental growth of commercial electronic mail that has overburdened electronic mail systems. *Wallace*, 498 F.Supp.2d at 1300. The court concluded that "[t]o interpret the Act in the limited manner as advocated by [d]efendant would conflict with the express language of the Act and would undercut the purpose for which it was passed." *Id.* This Court agrees that the Act should be interpreted expansively and in accordance with its broad legislative purpose.

  Facebook argues that *MySpace v. The Globe.com* and *MySpace v. Wallace* support its position that "messages sent and received within the Facebook site qualify as 'electronic mail messages' under the Act." (Pl.'s Opp., 2:23-24.) However, there are significant differences between the MySpace cases and this one. First, both of the MySpace cases involved "phishing schemes." Here, Facebook claims that MaxBounty and its affiliates rely primarily on actions taken by Facebook users themselves in order to further its alleged scheme. (Compl. ¶¶ 46-52.) In addition, all of the MySpace.com e-messages were delivered to a MySpace.com user "inbox." The defendants' arguments in those cases detailed the technical differences between e-messages

1 and traditional e-mail. *See MySpace v. Wallace*, 498 F.Supp.2d 1293, 1300 (C.D. Cal. 2007);
2 *Myspace v. The Globe.Com, Inc.*, 2007 WL 168696, at *4, (C.D. Cal. February 27, 2007)).

3       Notwithstanding these differences, in both MySpace cases the court rejected the argument
4 that an "electronic mail message" must be capable of characterization as "e-mail" or must be
5 directed to a traditional e-mail address or inbox. Instead, the court defined "electronic mail
6 address" as meaning nothing more specific than "a destination . . . to which an electronic mail
7 message can be sent, and the references to local part and domain part and all other descriptors set
8 off in the statute by commas represent only one possible way in which a destination can be
9 expressed." *MySpace v. Wallace*, 498 F.Supp.2d 1293, 1300 (C.D. Cal. 2007) (internal
10 quotations omitted); *see also Myspace v. The Globe.Com, Inc.*, 2007 WL 168696, at *4 fn 3
11 (C.D. Cal. February 27, 2007)). The court reasonably concluded that Congress was aware of
12 "various forms of electronic communications when it drafted the act" and thus the plain language
13 of "electronic mails address" includes "alternate forms while also recognizing that the most
14 commonly used form of electronic address was the traditional email with a local part and domain
15 part (i.e. user@domain.com)." *Wallace*, 498 F.Supp.2d at 1300.

16       Consistent with this approach, in order for the Facebook pages at issue to be considered
17 "electronic mail messages," they must be "sent to a unique electronic mail address," (15 U.S.C. §
18 7702(6)), that is, to "a destination . . . to which an electronic mail message can be sent . . . ."
19 (*Id*.) In MaxBounty's alleged scheme, a user is instructed to effect transmission of Facebook
20 pages to all of his or her Facebook friends. (Compl. ¶¶ 46, 50.) Based on a number of factors,
21 including individual user account settings, the pages are transmitted to destinations including the
22 user's "wall," the "news feed" or "home" page of the user's friends, the Facebook inbox of the
23 user's friends, and to users' external e-mail addresses. (Compl. ¶¶ 10-24; Pl.'s Opp., 4:24-5:3).

24       Significantly, these transmissions require at least some routing activity on part of
25 Facebook. "While the routing employed by [Facebook] may be less complex and elongated than
26 those employed by ISP's, *any* routing necessarily implicates issues regarding volume and traffic
27 utilization of infrastructure-issues which CAN-SPAM seeks to address." *The Globe.Com, Inc.*,
28 2007 WL at *5. A determination that the communications at issue here are "electronic

7

Case No. CV-10-4712
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
(JFEX2)

messages" thus is consistent with the intent of Congress to mitigate the number of misleading commercial communications that overburden infrastructure of the internet. 15 U.S.C. § 7701(a); *see also MySpace v. Wallace*, 498 F.Supp.2d 1293, 1300 (C.D. Cal. 2007)). Accordingly, the Court concludes that Facebook's CAN-SPAM Act claim is sufficiently pled.

### B. Whether Rule 9(b) Applies to Facebook's CFAA Claim.

Facebook alleges two violations of the CFAA. First, it claims that MaxBounty's conduct violates 18 U.S.C. § 1030(a)(4), which provides that:

> [w]hoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1 year period shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(4). Second, it alleges a violation of 18 U.S.C. § 1030(b), which provides that "[w]hoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section." 18 U.S.C. § 1030(b). MaxBounty concedes that the element of scienter ("knowingly and with intent") may be plead "generally," (MTD, 6:18-22; Def's Reply, 5:7-11),[4] but it contends that the "the Act's additional requirement of specific 'conduct' that 'furthers the intended fraud'" is subject to the heightened pleading requirements of Rule 9(b). (MTD, 6:18-22; Def's Reply, 5:7-26).[5]

This Court has held that fraud "under the CFAA only requires a showing of unlawful access; there is no need to plead the elements of common law fraud to state a claim under the Act." *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F.Supp.2d 1156, 1164 (N.D. Cal. 2009) (citing *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F.Supp.2d 1131 (E.D. Cal. 2008) ("The term 'defraud' for purposes of §1030(a)(4) simply means wrongdoing

---

[4] MaxBounty contends that Facebook's pleadings meet neither the heightened pleading standard under Rule 9(b) nor the lesser pleading standard under *Twombly/Iqbal*. (MTD, 7:14-21.)

[5] MaxBounty also argues that Rule 9(b) should apply to a claim brought pursuant to §1030(b) because the Ninth Circuit has applied a heightened pleading standard to claims of civil conspiracy to commit fraud. (MTD, 5:25-26) (citing *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 990-91 (9th Cir. 2006)).

Case No. CV-10-4712
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
(JFEX2)

and does not require proof of common law fraud.")). MaxBounty's reliance on *Motorola, Inc. v. Lemko Corp.*, 609 F.Supp.2d 760, 765 (N.D. Ill. 2009), is unpersuasive. Although the court in that case concluded that "Rule 9(b)'s requirement that '[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud,'" and that it "quite plainly applies to section 1030(a)(4)'s requirement that the defendant's acts further the intended fraud," (*Id.* at 765), the decision does not cite any authority for its conclusion. Indeed, approximately two months after its decision in *Motorola, Inc.* the same court held that:

> The heightened pleading standards of Rule 9(b) do not apply to the Computer Fraud and Abuse Act. Neither of the statutory provisions relied upon [1030(a)(2) & (a)(4)] by SKF require an allegation of fraud; intent to defraud is not the same and does not implicate the heightened standard. *Motorola*, 609 F.Supp.2d at 764-65 (holding that Rule 9(b) does not apply to a section 1030(g) claim alleging violations of sections 1030(a)(2) and (a)(4). . . .

*SKF USA, Inc. v. Bjerkness*, 636 F.Supp.2d 696, 719 fn 13 (N.D. Ill 2009). The Court sees no reason to depart from its previous analysis.[6]

### C. Whether Facebook Has Pled Common Law Fraud Sufficiently.

#### 1. Rule 9(b) standard

Under Fed. R. Civ. Pro. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." However, intent, knowledge, and other conditions of the mind may be averred generally. Fed. R. Civ. Pro. 9(b). A complaint meets this standard if it alleges "'the time, place, and content of the alleged fraudulent misrepresentation or omission; the identity of the person engaged in the fraud; and the circumstances indicating falseness' or 'the manner in which [the] representations [or omissions] were false and misleading.'" *Genna v. Digital Link Corp.*, 25 F.Supp.2d 1038 (N.D. Cal. 1997) (brackets in original) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547-58 n.7 (9th Cir. 1994)). Conclusory allegations that a defendant's conduct was fraudulent is insufficient. *In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427, 1432 (N.D. Cal. 1988).

#### 2. Common law fraud

---

[6] Since a violation of §1030(b) simply involves a claim of conspiracy to violate §1030(a)(4), a determination that Rule 9(b) does not apply to §1030(a)(4) also applies to claims under §1030(b).

The elements of a viable claim for fraud under California law, are: (1) a misrepresentation; (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e. to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Ct.*, 12 Cal.4th 631, 638 (1996). Generally, fraud allegations may not be based solely on information and belief. *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 638-39 (N.D. Cal. 1980). This general rule may be relaxed when facts are peculiarly within the knowledge of the other party. *Fong v. U.S.*, 300 F.2d 400, 409 (9th Cir. 1962) (holding that plaintiff's allegations were sufficiently plead because they stated facts primarily within the defendant's knowledge); *see also Russell v. Epic Healthcare Mngmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999) (finding the 9(b) standard may be relaxed when facts "relating to the alleged fraud are peculiarly within the perpetrator's knowledge . . . ."). Even under a more relaxed standard, a plaintiff "must still set forth the factual basis for his belief," and mere speculation and conclusory allegations are insufficient to state a claim. *Russell*, 193 F.3d at 308. Here Facebook alleges no facts concerning who at MaxBounty had knowledge of the alleged scheme, what those individuals knew, or how MaxBounty contributed to the alleged fraud. Nor does Facebook identify any of the affiliates responsible for creating the Facebook pages at issue. Facebook must provide significantly more factual detail in order for the Court to make a reasoned evaluation as to the plausibility of its claim.

### 3. Aiding and abetting the alleged fraud

"A claim for aiding and abetting requires (1) the existence of an independent primary wrong, (2) actual knowledge by the alleged aider and abettor of the wrong and his or her role in furthering it, and (3) substantial assistance in the wrong." *In re 3Com Securities Litigation*, 761 F. Supp. 1411, 1418 (N.D. Cal. 1990) (citing *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir. 1982)). "Substantial assistance requires that the defendant's actions be a 'substantial factor' in causing the plaintiff's injury." *Impac Warehouse Lending Group v. Credit Sussie First Boston LLC*, 270 Fed.Appx. 570, 572 (9th Cir. 2008) (internal citation omitted). Here Facebook has specifically described the primary wrong, which is the creation of fake Facebook pages that are intended to mislead Facebook users into spamming their friends and subsequently directing them

from Facebook's site to a third-party commercial site. (Compl. ¶¶ 86-89.)

However, neither the second or third element of aiding and abetting is adequately pled. Facebook claims conclusorily that MaxBounty knows its affiliates are creating misleading Facebook pages and aids and abets this activity by "providing technical support, suggestions for Pages, and financial incentives to affiliates." (Opp. to MTD, 8:18-21; *see also* Compl. ¶¶ 43-45, 85-88). These allegations merely provide a "formulaic recitation of a cause of action" and lack factual support. *Bell Atl.v. Twombly*, 550 U.S. 544, 555 (2007). .

### 4. Conspiracy

To state a claim for conspiracy, Facebook must plead "an agreement to participate in an unlawful overt act that is performed in furtherance of an agreement. The existence of this agreement may be either express or inferred from a defendant's conduct. However, a conspiracy to commit fraud must satisfy the particularity requirement of Rule 9(b)." *In re 3Com Securities Litigation*, 761 F. Supp. 1411, 1418 (N.D. Cal. 1990). Facebook's conclusory allegations that MaxBounty induced certain unidentified affiliates to carry out the alleged fraudulent scheme are inadequate to satisfy the heightened pleading standard. (Compl. ¶¶ 83-90).

### IV.  ORDER

Good cause therefore appearing, the motion to dismiss is GRANTED IN PART (as to Claim Three) and DENIED IN PART (as to Claims One and Two), WITH LEAVE TO AMEND. Any amended complaint shall be filed within (30) days of the date of this order.

IT IS SO ORDERED

DATED:   March 28, 2011

_____
JEREMY FOGEL
United States District Judge