Brian Hennessy, State Bar No. 226721
BHennessy@perkinscoie.com
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, California  94025
Telephone:  650.838.4300 / Facsimile:  650.838.4350

James McCullagh, *pro hac vice*
JMcCullagh@perkinscoie.com
Joseph Cutler, *pro hac vice*
JCutler@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Plaintiff
    FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation,<br><br>                              Plaintiff,<br><br>          v.<br><br>MaxBounty, Inc., a Canadian corporation,<br><br>                              Defendant. | Case No. 5:10-cv-04712-JF<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1) VIOLATION OF 15 U.S.C. § 7701, *et seq*, CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF 2003 ["CAN-SPAM"];**<br><br>**2) VIOLATION OF 18 U.S.C. § 1030, THE COMPUTER FRAUD AND ABUSE ACT;**<br><br>**3) FRAUD;**<br><br>**4) TORTIOUS INTERFERENCE WITH CONTRACT;**<br><br>**5) BREACH OF CONTRACT;**<br><br>**6) VIOLATION OF 15 U.S.C. § 1125(c), FEDERAL TRADEMARK DILUTION; AND**<br><br>**7) VIOLATION OF 15 U.S.C. § 1125(a); FALSE DESIGNATION OF ORIGIN;**<br><br>**[DEMAND FOR JURY TRIAL]** |

1

2      For its complaint, Facebook, Inc. ("Facebook") alleges as follows:

3
## I.    INTRODUCTION

4      1.     Defendant MaxBounty, Inc. ("Defendant"), an advertising company that uses its

5 proprietary network of affiliates to drive traffic to its customers' websites, is the mastermind and

6 beneficiary of a scheme that targeted Facebook's networking platform with unauthorized,

7 fraudulent and deceptive Facebook Pages and other communications in order to lure unsuspecting

8 Facebook users away from Facebook and to Defendant's customers' commercial websites.

9 Defendant's advertising schemes also involved inducing or tricking Facebook users into allowing

10 spam to be sent to all of their Facebook friends.  Defendant conspired with, instructed, and

11 encouraged its affiliates to carry out these schemes by providing them with assurances that their

12 advertising methods were legitimate, by encouraging and coaching affiliates on ways to increase

13 the effectiveness of their Facebook activities, and by providing technical support and substantial

14 financial gain to the affiliates who agreed to participate in the scheme.  Defendant, as the

15 mastermind, was a knowing and active participant in these schemes which also infringed

16 Facebook's trademarks and tarnished Facebook's brand.  The direct result of Defendant's actions,

17 for which it handsomely profited, was an almost immediate and viral spreading of these schemes

18 that wreaked havoc throughout a significant portion of Facebook's user base, tarnished

19 Facebook's brand, damaged its goodwill and required it to expend significant efforts to educate its

20 users, respond to their concerns and identify and weed out Defendant's affiliates' deceptive Pages

21 and schemes.  Facebook brings this lawsuit to stop Defendant's fraudulent and abusive use of its

22 services and to recover compensatory, statutory, aggravated and punitive damages, disgorgement

23 of the proceeds of Defendant's scheme and Facebook's reasonable costs and attorneys' fees

24 associated with this lawsuit.

25
## II.    PARTIES

26      2.     Plaintiff Facebook is a Delaware corporation with its principal place of business in

27 Palo Alto, California.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.      Defendant MaxBounty, Inc. is a Canadian corporation with its principal place of business in Ottawa, Canada.

### III.      JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction of this action under 28 U.S.C. § 1331 because the action alleges violations of the Lanham Act (15 U.S.C. §§ 1125(a) and (c)), the CAN-SPAM Act of 2003 (15 U.S.C. § 7701 *et seq.*) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

5.      This Court also has federal jurisdiction of this action under 28 U.S.C. § 1332, because the action is between corporations of different countries and the amount in controversy exceeds $75,000, excluding costs and interest.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims raised in this lawsuit occurred in this district and because Defendant agreed to comply with Facebook's Statement of Rights and Responsibilities ("Statement"), which provides that any dispute arising out of or related to the Statement shall be resolved by a state or federal court located in Santa Clara County.

7.      This Court has personal jurisdiction over Defendant because during all relevant times, Defendant repeatedly, knowingly and intentionally accessed and induced its affiliates to access Facebook servers located in California in furtherance of its deceptive and fraudulent marketing scheme.  In the course of its conduct, Defendant had systematic and continuous contacts with California and targeted its wrongful acts at Facebook, which it knew was headquartered in California.

8.      The Court also has personal jurisdiction over Defendant, because Defendant agreed to comply with the Statement and thereby agreed to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating these claims.

## IV.    INTRADISTRICT ASSIGNMENT

9.      Assignment to the San Jose Division of this Court is appropriate under Civil L.R. 3-2 because the claims asserted herein arose in the county of Santa Clara.  Facebook is headquartered in the county of Santa Clara and has servers located at several locations in this county.  Assignment to the San Jose Division of this Court is also appropriate because the parties have agreed that all claims between them would be resolved in Santa Clara County.

## V.    FACTS AND BACKGROUND

### A.    Facebook Background and Service

10.     Founded in February 2004, Facebook is a "social utility"—a network that helps people communicate more efficiently and effectively with their friends, family and co-workers. The company develops and provides online networking services that facilitate the sharing of information through the "social graph"—the digital mapping of people's real world social connections.  Through Facebook's website, the Facebook Platform, Social Plugins and other tools, hundreds of millions of Facebook users enjoy personalized and relevant Internet experiences.  As of the filing of this Complaint, more than 500 million active Facebook users spend more than 700 billion minutes per month on http://www.facebook.com, making the website the second most trafficked website in the United States.  More than 150 million Facebook users also engage with Facebook through external, third-party websites every month.  And more than one million websites have implemented tools made available by Facebook that engage users and make their websites more social and relevant.  Through Facebook, users can interact with over 900 million objects (individual and community pages, groups and events) and 30 billion pieces of content (web links, news stories, blog posts, notes, photo albums, etc.).

11.     One of the defining features of Facebook is that users are required to use their real identities.  Facebook users rely on the fact that users are required to use their actual identities such that they trust the authenticity of the communications coming from their Facebook friends.

12.     In order to access Facebook information and features available to Facebook users, a person must sign up for Facebook using his or her real name, select a unique password and

agree to the terms and conditions contained in Facebook's Statement before being granted authorization to access the protected information areas of Facebook.

13.     Once a user obtains a Facebook account, the user obtains a "profile" that may be populated with information about the user such as where he or she lives, his or her interests, biography, current and past education and work history.  Facebook users may connect their profiles to the profiles of other persons that they "friend" on Facebook.  A Facebook friendship is mutual.  Both users must agree to be friends before a friend connection is established.

14.     Business or other commercial, political or charitable organizations can create "Pages" that allow them to establish a presence on Facebook.  Facebook users can also connect their profiles to Pages.  The administrator of the Page must be an authorized representative of the subject of the Page.

15.     Facebook users may connect their profiles to Facebook Pages by clicking on the "Like" button that is located at the top of each Page.  By clicking on the Like button, a link to the Page is displayed on the user's profile in a list under the category "Likes," and the user's name and profile picture appear on the Page's list of "Friends" or "People" that Like the Page.

16.     Prior to implementing the "Like" button, Facebook allowed users to connect their profiles to Facebook Pages by clicking on a similar button labeled "Become a Fan."  The "Become a Fan" button operated the same way as the "Like" button:  By clicking on the "Become a Fan" button, a link to the Page was displayed on the user's profile under the category "Pages" and the user's name and profile picture appeared on the Page's list of "Fans."  The "Become a Fan" feature was discontinued when the "Like" button was implemented for Pages.

17.     Once a Facebook user connects his or her profile to his or her friends' profiles and desired commercial Pages, Facebook facilitates and enables connected profiles and Pages to communicate with each other.  Secure communication among Facebook users is vital to the integrity of Facebook's computer network as well as to the level of confidence that Facebook users have in using Facebook.

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

18.     Facebook users may only be contacted by other registered Facebook users or by Facebook itself.

19.     Each user profile and each Facebook Page has a "Wall," which is an area where registered users with access to the profile or Page may post content, including messages, links, pictures and videos.  Each profile and Facebook Page prominently displays the "Facebook" trademark referenced in paragraph 26 of this complaint in the upper left-hand corner of the webpage.  The Wall functions as a virtual bulletin board where recent posts are arranged chronologically, with the most recent post appearing on the top.

20.     In addition to the user's profile, which contains the Wall, Facebook provides each Facebook user with a "News Feed" or "home" page; this is the first page shown to Facebook users when they log into their Facebook accounts.  As with profiles and Pages, the News Feed prominently displays the "Facebook" trademark referenced in paragraph 26 of this complaint in the upper left-hand corner of the webpage.  The News Feed displays, among other things, communications from a user's friends and, activities performed by each of the user's friends and Facebook Pages to which the user has connected his or her profile.  For example, a user's News Feed on a given day could include updates posted by the user's friends or Pages to which the user has connected, posts made directly to the user's Wall, notices that friends became friends with other Facebook users, notices that a particular friend connected a Facebook Page to his or her profile, notices that new content was added to a Facebook Page's Wall, or notices that a link, photo or video was posted on a profile or Page Wall.  The activities that appear on the News Feed can be arranged chronologically with the most recent events posted at the top of the feed.  This feature enables users to instantly view the activities occurring on the various profiles and Pages to which they are connected without visiting each and every profile or Page.

21.     A registered user may share a Facebook Page by clicking on the "Share" link on the Page.  Clicking on this button brings up a window where the user can type a short note and then publish the note, a link to the Page and the picture icon of the Page to his or her Wall, which will then appear automatically in the News Feeds of all of that user's friends.  The user can also

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

opt to send this note as a direct electronic mail message to targeted friends, or can post it directly on another user's Wall.  This function enables users to share a link to the Page with a large number of users with minimal effort.  Using the "Share" feature often causes the user's friends to view the shared Facebook Page.

22.     For a period of time, registered users could also target a Facebook Page to only particular friends by clicking on the "Suggest to Friends" button.  When a user clicked on the "Suggest to Friends" button, an electronic mail message containing a link, icon, short description and an optional message was sent to selected friends inviting them to connect to the Page.  A Page suggestion often caused the recipients of the message to view the suggested Facebook Page to determine whether the user would like to connect to the Page.  Provided the sending user's privacy settings are not adjusted to prohibit it, the fact that a user suggested a Page was published to the user's Wall and also to the News Feeds of that person's friends.

23.     Facebook also provides a messaging service that allows users to send personal electronic mail messages directly to other Facebook users.  Such messages are not posted to the user's Wall or News Feed but instead are private between the sender and recipient(s).

24.     Facebook provides its users with tools that allow the customization of the ability to share or restrict certain information based on specific friends or friend lists on Facebook's network as well as the ability to have certain Facebook communications delivered to them by other messaging options, such as to have electronic mail messages sent to a user's Facebook account sent to a separate email account.

25.     Facebook devotes significant resources to combat unauthorized use of its website and service.  In addition to Facebook employees that continuously work to monitor and improve Facebook security, Facebook also provides users with tools that help them ensure that their accounts are not used by others.

LEGAL19825582.4

**B.     Facebook's Trademarks Are Famous**

26.     Facebook is the owner of the entire right, title and interest in and to a number of trademarks and service marks, including the following, for which Facebook owns federal applications or registrations covering a wide variety of goods and services:

- **FACEBOOK** <u>Registration:</u> Reg. No. 3801147 (first use for Classes 38, 41, and 42 February 28, 2004, first use for Class 9 August 31, 2006)

-  <u>Pending Applications:</u> Serial Numbers  77896325 and 77896323,

-  <u>Pending Application:</u> Serial Number, 77273570

27.     Attached to this Complaint as Exhibit A, and incorporated here by reference, are true and correct copies of the United States Patent and Trademark Office printouts of the online status pages for these trademarks.  All of the registrations noted in Exhibit A are valid, subsisting, unrevoked and uncancelled.  These registered trademarks are referred to collectively as the "Facebook Trademarks."

28.     Facebook has continuously used the Facebook Trademarks in interstate commerce in the United States since the date listed in paragraph 26, above, in connection with its goods and services.

29.     The Facebook Trademarks are highly distinctive with regard to Facebook's online networking services.

30.     As a result of Facebook's widespread use of the Facebook Trademarks worldwide, its prolific presence on third party websites, the continuous and unsolicited media coverage of Facebook, the high degree of consumer recognition of the Facebook Trademarks and the strong and loyal base of customers that regularly use and enjoy Facebook's services, the Facebook

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

Trademarks are famous within the meaning of Section 43(c) of the United States Trademark Act, 15 U.S.C. §1125(c).

## C.   Facebook's Statement of Rights and Responsibilities

31.   In order to obtain authorization to access user information maintained by Facebook, users must agree to comply with the requirements set forth in the Statement and incorporated documents.  Facebook has established the Statement and associated guidelines in order to limit access and use of its network to permissible uses.  Facebook has determined that this is necessary to protect Facebook users from abuse, protect the privacy of their personal information, protect the security of the content they have entrusted Facebook with and protect the Facebook brand.

32.   Facebook's Statement includes, among other things, specific terms for Facebook profiles, Pages ("Pages Terms") and for advertising ("Advertising Guidelines").

33.   All Facebook users, including Defendant, affirmatively agree to comply with the Statement before Facebook creates an account for them or allows them access to certain features of the Facebook website.  The Statement sets forth acceptable uses of Facebook and prohibits users from conducting certain activities.  A true and correct copy of Facebook's current Statement is incorporated here by reference and attached as Exhibit B.

34.   Facebook's Statement prohibits Facebook users from:

a.   using Facebook to do anything unlawful, misleading or malicious;

b.   using Facebook's trademarks without Facebook's written permission;

c.   sending or otherwise posting unauthorized commercial communications (such as spam) on Facebook;

d.   collecting users' content or information or otherwise accessing Facebook using automated means without Facebook's permission;

e.   using Facebook in any unlawful manner or in any other manner that could damage, disable, overburden or impair the Facebook website;

f.   facilitating and encouraging violations of the Statement by others; and

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

g.   uploading malicious code.

35.     The Statement also addresses the permissible use of Facebook Pages by expressly referencing and incorporating Facebook's Pages Terms, which contain the following restrictions:

a.   Pages may only be used to promote a business or other commercial, political or charitable organization or endeavor (including nonprofit organizations, political campaigns, bands and celebrities);

b.   Only an authorized representative of the subject of the Page may administer the Page;

c.   Pages can only post content and information under the "everyone" setting; and

d.   If the Page contains any form of advertising, then Section 11 of the Statement, and also the Advertising Guidelines apply to the Page and its administrator.

36.     Facebook's current Pages Terms are incorporated here by reference and attached as Exhibit C.

37.     The Statement also includes reference to Facebook's Advertising Guidelines, which apply to all advertisements appearing on Facebook, including advertisements in Facebook Pages.

38.     Facebook's Advertising Guidelines include the following restrictions:

a.     Advertisers cannot create or manage multiple Facebook accounts for advertising purposes unless given permission by Facebook to do so;

b.     Advertisements that contain a URL or domain in the body must link to that same URL or domain;

c.     Advertisements must not be false, misleading, fraudulent or deceptive;

d.     Advertisements cannot be deceptive or fraudulent about any offer made;

e.     Advertisements must clearly represent the company, product or brand that is being advertised;

f.     Products or services promoted in the advertisement must be directly available on the landing page;

g.      Advertisements must not include unsubstantiated claims, including but not limited to prices, discounts or product availability;

h.      If an advertisement includes a price, discount or "free" offer, (1) the destination URL for the ad must link to a page that clearly and accurately offers the exact deal the advertisement has displayed, and (2) the advertisement must clearly state what action or set of actions is required to qualify for the offer;

i.      Advertisements may not contain, promote or reference "get rich quick" and other money making opportunities that offer compensation for little or no investment, including "work from home" opportunities positioned as alternatives to part-time or full-time employment or promises of monetary gain with no strings attached;

j.      Advertisements cannot contain, facilitate or promote "spam" or other advertising or marketing content that violates applicable laws, regulations or industry standards;

k.      If obtaining the benefit of the advertisement requires the user to subscribe to a service, the service and offer requirements must both be stated in the advertisement and on the Facebook Page;

l.      If obtaining the benefit of the advertisement requires a recurring subscription, the benefit to be obtained must be consistent with what is promoted in the advertisement copy;

m.      With respect to subscription services, the promoted website must clearly and accurately display the price and billing interval on the landing page as well as on any page that prompts a user for personally identifiable information or billing information (including a mobile phone number or credit card number); and

n.      If the service is a subscription, the website must provide a prominent opt-in checkbox or other clear mechanism indicating that the user knowingly accepts the price and subscription service.

39.     Facebook's current Advertising Guidelines are incorporated here by reference and attached as Exhibit D.

-11-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Defendant's Unauthorized and Fraudulent Activities**

40.      Defendant is a registered Facebook user, operating a Facebook Page in support of its business, and during all relevant times has been and is bound by its express agreement to abide by Facebook's Statement, Pages Terms, and Advertising Guidelines.

41.      Defendant has engaged, and continues to engage, in activities on the Facebook website and elsewhere.

42.      At no time has the Defendant received permission from Facebook to conduct any activity on Facebook's website that exceeds the authorization provided in the Statement and incorporated Advertising or Pages Guidelines. As described on Defendant's website, http://www.maxbounty.com/faq.cfm, Defendant is an advertising company that operates an affiliate marketing program, otherwise known as a Cost Per Action (or "CPA") marketing program.  Under this program, Defendant recruits individuals (or "affiliates") to create web pages that drive traffic to Internet websites that have contracted with Defendant.  Under the CPA marketing model, the contracting website pays for the traffic these affiliates generate only when some specific action is taken on the website, such as filling out a form or completing a purchase. The advertiser defines this action in advance.  As a general rule, the more complex the action required, the higher payment Defendant's affiliates receive per participant.

43.      Many of Defendant's affiliates generate traffic for Defendant's customers through fraudulent and deceptive means, including false and deceptive promotions posted to Facebook Pages.

44.      For example, one of Defendant's affiliate's Pages, which necessarily displayed the Facebook Trademarks, was titled "MACcosmetics.com Earn a $250 GIFT CARD! Registration Required", and included the following text: "You Are Invited To Receive This Exclusive Offer For A Limited Time Only!  Act Now To Get Your Free $250 M.A.C. Gift Card!  This is only for a limited time, so be sure to enter right now!  Get started by following the three steps below." This Page was active on Facebook between at least March and June 2010.  "Step 1" required Facebook users to "Become a Fan" of this Page, which would in turn reveal steps 2 and 3.  Step 2

asks users to "Invite your friends" to the Page, noting that "If you do not invite ALL of your friends you may not be eligible [for the gift card]."  Step 3 is to "Register for your $250 gift card", which explains that "After a short Registration process your gift card will be mailed to you shortly."

45.    The statements that completing the three steps would result in a free $250 M.A.C. gift card were false and misleading.  Once Facebook users completed these three steps, they were not given a free $250 M.A.C. gift card, but instead directed to a domain registered to and managed by Defendant that then redirected users to a third-party commercial website, in this case Superb-Rewards.net.

46.    The website at Superb-Rewards.net collected personal information from Facebook users and tricked Facebook users into spending money on commercial products and services that were unrelated to the original "free $250 M.A.C. gift card" promise on Defendant's affiliate's Facebook Page.  The landing page at Superb-Rewards.net explains that to receive a gift card, the user must complete three additional steps, including to sign up for 13 "sponsor offers," which for the most part are offers for membership to various subscription-based services for music, movies, coffee, newspapers, magazines, and other commercial offers, many of which required payment of significant monthly fees.  Defendant received payment for the traffic that it delivered to Superb-Rewards.net based on the users who successfully completed the steps to receive a free gift.

47.    As another example, Defendant's affiliates also created a Facebook Page with the title "FREE Apple iPad TESTERS WANTED."  This Page, which was active on the Facebook site from at least March 2010 to June 2010, informed Facebook users that in order to become a "tester" and receive a free Apple iPad, the user had to (1) become a fan of the Page, (2) send unsolicited invitations to all of their Facebook friends to visit the Page, and (3) click on a link to a third-party website and provide personal information to that site.  This affiliate's Page also contained malicious computer code that the user could cut and paste in order to automatically send invitations to the user's friends.  When users completed these three steps they were not given

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

a free iPad but instead their browsers were redirected through Defendant's website to a third-party commercial website, Better-Gifts.net.

48.     The website at Better-Gifts.net, which is nearly identical in content to the website at Superb-Rewards.net described in paragraph 47 above, collects personal information from Facebook users and markets products and services that are unrelated to the original Facebook Page that users had visited.  Defendant received payment for the traffic that it delivered to Better-Gifts.net based on the users who successfully completed the steps to receive their free gift.

49.     Defendant, through its employees, knowingly assists its affiliates in creating these Pages.  For example, one of Defendant's employees, Adam Harrison, contacts affiliates who use Facebook Pages to generate customer traffic, identifies himself as Defendant's Facebook Affiliate Manager, and encourages and directs these affiliates to make specific changes to their promotional Facebook Pages in order to make them more profitable to Defendant.

50.     Defendant's employees, including at least Mr. Harrison and likely others, directly encourage certain of its affiliates to generate traffic for its contracting advertisers through fraudulent and deceptive means, including posting false and deceptive promotions on the Facebook site.

51.     In order to accomplish this, Defendant's employees, including at least Mr. Harrison and likely others, mislead its affiliates into believing that Defendant's campaigns are approved by Facebook, provide instruction and support on how to design these unauthorized Facebook campaigns, and provide substantial advance payments to its affiliates that agree to participate in these campaigns.

52.     For example, in March 2010, one of Defendant's affiliates, Mitchell Fillmore, created Facebook Pages that offered a free IKEA gift card using the same scheme as generally described in the paragraphs 44-48 above.  Mr. Fillmore was then contacted by Mr. Harrison, who informed Mr. Fillmore that he was a MaxBounty Affiliate Manager for affiliates who create Pages on Facebook.  Mr. Harrison provided Mr. Fillmore with technical help for designing Facebook Pages and for increasing the number of Facebook users who would receive notice and

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

act upon the offers presented in Mr. Fillmore's Facebook Pages.  Mr. Harrison also encouraged Mr. Fillmore to run other Facebook campaigns for other similar offers and to use techniques that were designed to increase the effectiveness of these campaigns.

53.   Mr. Fillmore followed the advice given by Mr. Harrison, but noticed many of his Facebook Pages were taken down by Facebook not long after they were posted.  Mr. Fillmore grew concerned that his campaigns were not permitted by Facebook.  When Mr. Fillmore raised these concerns to Mr. Harrison, Mr. Harrison assured Mr. Fillmore that MaxBounty approved of the techniques used by Mr. Fillmore.  He also offered Mr. Fillmore a $30,000 cash advance to continue creating similar Facebook Pages.

54.   Through Mr. Harrison, and likely through other employees, Defendant encourages and instructs its affiliates on techniques intended to deceptively induce Facebook users to send unsolicited commercial messages (spam) to their friends suggesting that they also visit Defendant's affiliates' Facebook Pages.  As described in the paragraphs above, Defendant's affiliates accomplish this by inducing Facebook users to send the messages, by stating on the Facebook Page that users will not receive their free gift unless they send such a message to ALL their Facebook friends, and by tricking Facebook users into executing malicious computer code that causes messages to be automatically sent to all their Facebook friends.

55.   Defendant knows and keeps track of which affiliates send traffic to its customers' websites as well as the volume of traffic that originates from Facebook.  Defendant monitors its affiliates' performance and actively works to improve the effectiveness of campaigns that are run on Facebook.

56.   Defendant knows or should know that the techniques that it is recommending and encouraging its affiliates to use violate Facebook's Statement, Pages Guidelines and Advertising Guidelines, and are otherwise deceptive.

57.   Defendant's affiliates' Facebook Pages and deceptive campaigns violate Facebook's Statement, Pages Guidelines and Advertising Guidelines in multiple ways, including but not limited to: failing to provide notice of paid subscription offers; failing to offer the same

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

products on the Facebook Pages that are offered to the user on the commercial website landing pages; and inducing Facebook users to send unsolicited commercial messages (spam) to other Facebook users.

**E.     Harm to Facebook**

58.     Defendant's misleading and deceptive schemes have tainted the Facebook experience for the affected Facebook users and caused many of them real economic loss in the form of undisclosed subscription fees.

59.     Facebook has suffered and continues to suffer significant harm to its reputation and goodwill due to Defendant's actions.  Facebook has suffered more than $5,000 in economic damages attributable to its efforts and resources used to combat Defendant's affiliates' spam, to combat Defendant's and Defendant's affiliates' unauthorized access to Facebook accounts and servers, to respond to user complaints and provide assistance in preventing Defendant and its affiliates from continued unauthorized use of Facebook's services, and to identify and locate Defendant and its affiliates.

60.     Defendant has induced, and continues to induce, its affiliates to engage, willfully and maliciously, in unauthorized access to and misappropriation of Facebook computers, servers, systems, networks and data, including network information, and Facebook user information.

61.     Defendant has encouraged, and continues to encourage, its affiliates to induce Facebook users to use automated means to initiate and send, willfully and maliciously, unsolicited commercial messages, and has done so in order to defraud Facebook users and profit from these illegal and improper spamming campaigns.

62.     Defendant has been unjustly enriched by its activities at the expense of Facebook and its users.

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

# VI.    CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION – VIOLATION OF CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF 2003 ("CAN-SPAM"),
### 15 U.S.C. § 7701, *et seq.*

63.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

64.    Facebook is an Internet access service as defined in 15 U.S.C. § 7702(11) because it provides a service that enables users to access content, information, electronic mail or other services offered over the Internet and may also include access to proprietary content, information and other services as part of a package to consumers.

65.    Facebook's website and computers operate in interstate and foreign commerce and communication and are therefore protected computers under 15 U.S.C. § 7702(13).

66.    Electronic messages sent between users on the Facebook site, including direct messages, Wall Posts, Page suggestions, and other communications are "electronic mail messages" as described in 15 U.S.C. § 7702(6).

67.    Defendant knowingly and willingly participates with Defendant's affiliates in procuring Facebook users to send, or take actions that cause commercial electronic messages to be sent, to all the Facebook users' friends on Facebook.  Facebook users take such action because they were led to believe they would receive valuable consideration if they send commercial messages to their friends.  The electronic messages initiated by Defendant's affiliates are "commercial" electronic messages because their primary purpose was the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose) as provided in 15 U.S.C. § 7702(2)(A).

68.    Defendant induces its affiliates to initiate commercial messages on Facebook and thereby procures the origination or transmission of such message as provided in 15 U.S.C. § 7702(9).

69.    Defendant intentionally misleads Facebook users by inducing its affiliates to initiate the transmission of commercial electronic messages through Facebook's computers to

-17-

Facebook users that contain header information that is materially false or misleading as to the true identity of the initiator of the messages in violation of 15 U.S.C. § 7704(a)(1).

70.     Defendant, through its affiliates, initiates the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users that do not contain a functioning return electronic mail address or other Internet-based opt-out mechanism in violation of 15 U.S.C. § 7704(a)(3).

71.     Defendant, through its affiliates, initiates the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users that do not contain clear and conspicuous identification that the messages are advertisements or solicitations, clear and conspicuous notice of the opportunity to decline to receive further commercial emails from the sender or a valid physical postal address of the sender in violation of 15 U.S.C. § 7704(a)(5).

72.     Defendant, through its affiliates, initiates the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users that contain subject headings that are misleading regarding the contents or subject matter of the message and misleading regarding Facebook's connection to the messages in violation of 15 U.S.C. § 7704(a)(2).

73.     Facebook is informed and believes and, based thereon alleges, that Defendant induces its affiliates to initiate the transmission of the misleading commercial electronic messages with actual knowledge or knowledge fairly implied on the basis of objective circumstances that the messages' subject heading was likely to mislead a recipient acting reasonably under the circumstances.

74.     Facebook is informed and believes, and based thereon alleges, that Defendant induces its affiliates to initiate the transmission of commercial electronic messages, in a pattern or practice, through Facebook's computers to Facebook users, that are misleading and unlawful under 15 U.S.C. § 7704(a), as alleged above, or assists in the origination of such messages

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

through the provision or selection of addresses to which the messages are transmitted as defined in 15 U.S.C. § 7704(b)(1).

75.     Defendant has knowledge of its affiliates' violations of 15 U.S.C. § 7704 and control over its affiliates' actions.

76.     Defendant has knowledge of its affiliates' violations of 15 U.S.C. § 7704, and intends that its affiliates take such actions.

77.     Defendant causes Facebook harm by causing higher-bandwidth utilization, by causing Facebook to expend significant employee time and sums of money combating the unsolicited commercial messages initiated by Defendant and responding to user complaints, by deterring users and potential users from using Facebook, by damaging Facebook's goodwill and reputation with its customers; and by causing other injuries to Facebook.

78.     Facebook is entitled to the greater of its actual monetary loss or statutory damages as provided by 15 U.S.C. § 7706(g)(1)(B), in an amount to be proven at trial.

79.     Facebook is entitled to an award of aggravated damages in an amount equal to three times the amount otherwise available pursuant to 15 U.S.C. § 7706(g)(3)(C) because Defendant violated CAN-SPAM willfully and knowingly and because Defendant's unlawful activity included one or more of the aggravated violations set forth in 15 U.S.C. § 7704(b).

80.     Facebook is entitled to reasonable costs, including reasonable attorneys' fees as provided by 15 U.S.C. § 7706(g)(4).

**SECOND CAUSE OF ACTION – COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq.***

81.     Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

82.     Facebook's computers are involved in interstate and foreign commerce and communication and are protected computers under 18 U.S.C. § 1030(e)(2).

83.     Upon information and belief, Defendant knowingly and with intent to defraud induces its affiliates to access Facebook's computers without authorization or in excess of

-19-

authorization as defined by Facebook's Statement, Pages Terms and Advertising Guidelines, and by means of such conduct, furthers its intended fraud and obtained payment from affiliate marketers in violation of 18 U.S.C. § 1030(a)(4).

84.     Defendant knowingly and with intent to defraud provides inducement in the form of misleading information, technical support, and monetary payments to its affiliates to access Facebook's computers without authorization or in excess of authorization as defined by Facebook's Statement, Pages Terms and Advertising Guidelines, and by means of such inducement, furthered its intended fraud and obtained payment from affiliate marketers in violation of 18 U.S.C. § 1030(a)(4).

85.     Through the activities described in paragraphs 81-84, Defendant conspires with its affiliates to violate 18 U.S.C. § 1030(a)(4) in violation of 18 U.S.C. § 1030(b).

86.     Defendant's conduct caused a loss to Facebook during a one-year period in excess of $5,000.

87.     Defendant's conduct has also caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

88.     Facebook has been damaged by Defendant's actions, including by being forced to expend resources to investigate and prevent the unauthorized access and abuse of its computer network.  Facebook seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

### THIRD CAUSE OF ACTION – FRAUD

89.     Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

90.     Facebook is informed and believes and, based thereon, alleges that Defendant intended to and in fact did defraud Facebook.

91.     Defendant's affiliates represent to Facebook and its users that the Facebook Pages they develop contain content related to the subject of the Page and that the Pages comply with

-20-

Facebook's Statement, Pages Terms and Advertising Guidelines.  These representations are in fact false and Defendant and its affiliates know that the representations were false.

92.     Defendant's affiliates initiate spam on the Facebook network and create and use fraudulent and deceptive campaigns using Facebook Pages that promise free goods and services that neither Defendant nor its affiliates provide or intend to provide.  Each of these activities is prohibited by the Statement and by Facebook's Advertising Guidelines, which are incorporated into the Statement.

93.     Defendant is aware that its affiliates are defrauding Facebook and Facebook's users and intends that its affiliates take such actions.  Defendant authorizes and is aware that its employees, including Mr. Harrison, contact affiliates who are successful in using Facebook Pages to generate customer traffic, including Mr. Fillmore, in order to provide encouragement and technical suggestions on ways to further profit from traffic originating from Facebook.

94.     Defendant's employees review and approve affiliates' Pages that violate Facebook's Terms.

95.     Defendant also provides financial incentives to these affiliates to increase traffic from Facebook to Defendant's customers' websites.

96.     Defendant receives increased revenue from its customers as a result of these deceptive acts.

97.     Defendant directly conceals or suppresses material facts by representing that it is in compliance with Facebook's Statement when it in fact encourages its affiliates to use the Facebook Platform in ways that are expressly prohibited by the Statement.

98.     Defendant induces its affiliates to make false representations to Facebook with the intent to defraud and induce Facebook into permitting Defendant's affiliates to use Facebook's platform and services and to defraud and induce Facebook users to visit the sites that pay Defendant for traffic.

99.     When Facebook hosts Defendant's affiliates' Pages on the Facebook platform, Facebook does not know that Defendant's affiliates' representations are false but instead

-21-

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

reasonably relies on Defendant's affiliates' representations that their use complies with Facebook's Statement.

100.    At the time Facebook users click on the links, the users do not know that the Defendant's affiliates' representations are false and instead believe they are true.

101.    Facebook and its users act in justifiable reliance upon the truth of the Defendant's and Defendant's affiliates' representations.

102.    In justifiable reliance upon Defendant's and Defendant's affiliates' agreement to abide by the Statement and associated Guidelines, Facebook allowed Defendant and its affiliates to create and maintain Pages on Facebook.

103.    Facebook has suffered and continues to suffer significant harm to its reputation and goodwill as a result of its reliance on Defendant's and Defendant's affiliates' representations and conduct.  Facebook has already suffered significant economic damages attributable to the effort and resources used to combat the spam procured by Defendant's affiliates, to identify and remove the Facebook Pages created by Defendant's affiliates, to combat Defendant's affiliates' unauthorized access to Facebook accounts and servers, to address the harm to its reputation and goodwill, and to identify and locate Defendant and certain of Defendant's affiliates.

104.    Through the actions described in the preceding paragraphs, Defendant aids and abets its affiliates' fraud.  Defendant has actual knowledge of its affiliates' fraud and provides substantial assistance in furtherance of the fraud by assigning affiliates who are generating a significant amount of Facebook traffic to specific Facebook Affiliate Managers like Adam Harrison, who review affiliates' Pages and give suggestions for deals and content designed to maximize traffic to Defendant's customers' websites.

105.    Through the actions described in the preceding paragraphs, Defendant enters into a conspiracy with its affiliates to defraud Facebook by knowingly entering into an agreement to pay its affiliates for traffic generated through deceptive Facebook Pages.

106.    Facebook is entitled to injunctive relief, compensatory damages and punitive damages in an amount to be determined at trial.

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

**FOURTH CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT**

107.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

108.    Use of Facebook's site and services is governed by and subject to Facebook's Statement.

109.    At all times relevant to this dispute, users of Facebook's site and services have been required to agree to Facebook's Statement in order to access Facebook's site and services.

110.    Defendant affirmatively accepted and agreed to Facebook's Statement and knew or should have known that all Facebook users were required to accept and agree to Facebook's Statement in order to access Facebook's site and services.

111.    Facebook's Statement prohibits users of Facebook from sending or otherwise posting unauthorized commercial communications (such as spam) on Facebook, from inducing other Facebook users to breach the terms of the Statement, from misleading Facebook users and from violating Facebook's Pages Terms and Advertising Guidelines.

112.    Defendant intends to induce its affiliates to violate Facebook's Statement and send spam to Facebook users.

113.    Defendant intends to induce Facebook users to breach the Statement by encouraging its affiliates to induce such users to utilize automated scripts that sent spam to their friends.

114.    When Facebook users utilize Defendant's affiliates' automated scripts to send spam to their friends, they breach Facebook's Statement.

115.    Through the actions described in the preceding paragraphs, Defendant entered into a conspiracy with its affiliates to intentionally interfere with Facebook's contracts with its users.

116.    As a result of this breach, hundreds of thousands of Facebook users receive unwanted commercial communications disguised as personal messages from their friends that they otherwise would not have received.

LEGAL19825582.4

117.   The breaches induced by Defendant directly and proximately harmed Facebook. Facebook has suffered and continues to suffer significant harm to its reputation and goodwill.

118.   Facebook is entitled to injunctive relief, compensatory damages and punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION – BREACH OF CONTRACT

119.   Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

120.   Use of Facebook's site and services, the creation of Facebook Pages on the Facebook network and the placement of advertisements on Facebook Pages are governed by and subject to Facebook's Statement, Pages Terms and Advertising Guidelines.

121.   At all times relevant to this dispute, users of Facebook's site and services have been required to agree to Facebook's Statement in order to access Facebook's site and services, create Facebook Pages on the Facebook network and place advertisements on Facebook Pages.

122.   Defendant affirmatively accepted and agreed to Facebook's Statement.

123.   Facebook's Statement is binding on Defendant.

124.   Facebook has performed all conditions, covenants and promises required of it in accordance with its Statement.

125.   Defendant, through its actions as described above, knowingly, willfully, repeatedly and systematically breached Facebook's Statement, Pages Terms and Advertising Guidelines through its conduct as alleged in this Complaint.

126.   Upon information and belief, Defendant induces its affiliates to breach Facebook's Statement, Advertising Guidelines and Pages Terms in direct violation of its own obligations under the Statement.  Defendant's affiliates' breaches include, but are not limited to, initiation of spam messages, using automated scripts on Facebook's network, confusing, misleading, surprising and defrauding Facebook users, placing advertisements on Facebook Pages that contain URLs that do not end at that same landing page, placing false, misleading, fraudulent and

-24-

deceptive advertisements on Facebook, and offering recurring subscriptions without permission or proper notice.

127.     Defendant's breaches of Facebook's Statement, Pages Terms and Advertising Guidelines directly and proximately caused and continue to cause Facebook irreparable and incalculable harm and injury.

128.     Facebook is entitled to injunctive relief, compensatory damages and punitive damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION – FEDERAL TRADEMARK DILUTION – 15 U.S.C. § 1125(c)**

129.     Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

130.     As a result of the enormous publicity afforded the Facebook Trademarks and the strong and loyal base of customers that enjoy Facebook's services, the Facebook Trademarks have a high degree of consumer recognition, are widely recognized by the general consuming public of the United States as a designation of Facebook's goods and services and are famous.

131.     The Facebook Trademarks became famous before Defendant began its infringing activities.

132.     Defendant is liable for contributory infringement because it intentionally induces its affiliates to use and cause to be displayed the Facebook Trademarks in the course of their unauthorized activities.  Defendant's affiliates' unauthorized use of the Facebook Trademarks causes dilution by tarnishment of the distinctive quality of the Facebook Trademarks when Facebook users associate the negative experience of participating in Defendant's affiliates' deceptive Facebook Pages scheme with the goods and services normally offered by Facebook under those same marks.

133.     Facebook is informed and believes and, based thereon, alleges that Defendant intends to induce its affiliates to create an association with the Facebook Trademarks and to trade on the widespread recognition of the Facebook Trademarks.

134.    Defendant's affiliates' unauthorized use of the Facebook Trademarks is achieved with Defendant's notice and full knowledge that such use is not authorized or licensed by Facebook.

135.    Despite having knowledge or reason to know of Defendant's affiliates' infringement of Facebook's marks, Defendant continues to allow Defendant's affiliates to promote and advertise its advertisers' products and services.

136.    Through the actions described in the preceding paragraphs, Defendant entered into a conspiracy with its affiliates to dilute Facebook's trademarks.

137.    Defendant's affiliates' unauthorized use of the Facebook Trademarks is in direct violation of Facebook's Statement, Pages Terms, and Advertising Guidelines.

138.    Defendant's aforesaid acts are in knowing and willful violation of Facebook's rights under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

139.    The distinctive nature of the Facebook Trademarks is of enormous value, and Facebook is suffering and will continue to suffer irreparable harm if Defendant's wrongful conduct is allowed to continue.

140.    Facebook is entitled to injunctive relief against Defendant, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial consisting of, among other things, disgorgement of Defendants' profits, diminution in the value of the goodwill associated with the Facebook Trademarks, and costs and attorneys' fees.

141.    Defendant's conduct has caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

142.    Defendant's wrongful use of the Facebook Trademarks is deliberate, willful, fraudulent and without any extenuating circumstances and constitutes a willful intent to trade on Facebook's reputation or to cause dilution of the famous Facebook Trademarks.  It is an exceptional case within the meaning of Lanham Act § 35, 15 U.S.C. § 1117.  Facebook is

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

therefore entitled to recover three times the amount of its actual damages, attorneys' fees and costs incurred in this action and prejudgment interest.

### SEVENTH CAUSE OF ACTION – FALSE DESIGNATION OF ORIGIN, 15 U.S.C. § 1125(a)

143.    Plaintiff Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 62.

144.    In connection with Defendant's services, Defendant has induced its affiliates to use in commerce, without Facebook's authorization or consent, the Facebook Trademarks.

145.    Defendant's affiliates' unauthorized use of the Facebook Trademarks is likely to cause confusion, mistake or deception among the consuming public regarding the affiliation, connection or association of Defendant, its affiliates and its customers with Facebook.

146.    Through the actions described in the preceding paragraphs, Defendant has entered into a conspiracy with its affiliates to misappropriate the Facebook Trademarks.

147.    Defendant's affiliates' unauthorized use of the Facebook Trademarks is likely to cause confusion, mistake or deception among the consuming public that Facebook has authorized, approved or in some way sponsored Defendant's and its affiliates' services.

148.    Defendant's affiliates' unauthorized use of the Facebook Trademarks constitutes the use of a false designation of origin and false description or representation of fact, all in violation of 15 U.S.C. § 1125(a).

149.    Plaintiff is entitled to injunctive relief against Defendant, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial consisting of, among other things, disgorgement of Defendant's profits, and diminution in the value of the goodwill associated with the Facebook Trademarks, and costs and attorney's fees.

150.    Defendant's conduct has also caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

-27-

151.    Defendant's wrongful use of the Facebook Trademarks is deliberate, willful, fraudulent and without any extenuating circumstances and constitutes a willful intent to trade on Facebook's reputation or to cause dilution of the famous Facebook Trademarks.  It is an exceptional case within the meaning of Lanham Act § 35, 15 U.S.C. § 1117.  Facebook is therefore entitled to recover three times the amount of its actual damages, attorneys' fees and costs incurred in this action and prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Facebook prays for the following relief:

A.      For injunctive relief, as follows:  A preliminary and permanent injunction enjoining and restraining Defendant from:

1.      accessing or attempting to access Facebook's website, services and computer systems;

2.      engaging in any unlawful, misleading or malicious activities directed at or relating to the Facebook network or Facebook users;

3.      accepting affiliate networking referrals of any kind from Facebook;

4.      initiating unsolicited commercial electronic mail messages to Facebook accounts;

5.      procuring unsolicited commercial electronic mail messages to Facebook accounts;

6.      engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of or impairs the functionality of Facebook's site or services;

7.      engaging in any further infringing or diluting acts against the Facebook Trademarks; and

8.      engaging in any activity that violates Facebook's Statement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      An order requiring Defendant to account for, hold in constructive trust, pay over to Facebook and otherwise disgorge all profits derived by Defendant from its unlawful conduct and unjust enrichment, as permitted by law;

C.      An award to Facebook of damages, including but not limited to, compensatory, statutory, aggravate, and punitive damages, as permitted by law and in such amounts to be proven at trial;

D.      An award to Facebook of reasonable costs, including reasonable attorneys' fees;

E.      For pre- and post-judgment interest as allowed by law; and

F.      For such other relief as this Court may deem just and proper.

DATED:  April 19, 2011                              **PERKINS COIE** LLP

By: */s/ James R. McCullagh*

Attorneys for Plaintiff
FACEBOOK, INC.

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF

1

## <u>JURY DEMAND</u>

2

     Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury as to

3

all issues so triable in this action.

4

5

DATED:  April 19, 2011

                            **PERKINS COIE LLP**

6

                            By:  /s/ *James R. McCullagh*

7

8

                            Attorneys for Plaintiff
                            FACEBOOK, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-30-

FIRST AMENDED COMPLAINT
Case No. 5:10-cv-04712-JF